UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Daniel E. Hall</u>

     v.                         Civil No. 08-cv-101-JL
                                    Opinion No. 2009 DNH 015

<u>Kent A. Brooks <i>et al.</i></u>

**<u>O R D E R</u>**

Daniel Hall, proceeding pro se, has sued a number of parties for their participation in selling a parcel of commercial property in which he held an option to purchase, to wit:

- his own attorney, and the attorney's law firm;

- his own real estate broker, and the broker's agency;

- the title company that handled the closing;

- an employee of that agency who, Hall alleges, acted as the buyer's "inside man" during the transaction, and a company controlled by that employee;

- the buyer and a number of companies he controls;

- a person who, Hall alleges, was falsely portrayed as the buyer's broker;

- a person who financed the buyer's acquisition of the parcel;

- a New Hampshire state judge;[1] and

---

[1]This defendant, sued under the fictitious name of "Jane Doe," has not been properly served.  Though Hall purported to serve her by publication, the court ruled that method of service defective by way of a prior order, then denied Hall's motion to reconsider.  Because Doe has not been timely served, the court dismisses any claims against her.  <u>See</u> Fed. R. Civ. P. 4(m).

• the chairman of the New Hampshire Real Estate Commission. Together with various state-law claims, Hall has alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO").

The defendants have filed motions to dismiss this action on a number of grounds.  For the foregoing reasons, the defendants' motions to dismiss are granted.

## I.   Background

While Hall's amended complaint is prolix, its relevant allegations are simple.[2]  Hall and his then-business partner, Lewis Fortin, held a lease on the parcel, located on Second Street in Manchester, New Hampshire, where their automobile repair business was located.  The lease gave Hall and Fortin the option to purchase the property.

To locate a buyer for this interest, Hall and Fortin engaged a real estate broker, defendant Fini Real Estate Group, Inc.[3], in

---

[2]After some of the motions to dismiss had been filed, Hall successfully moved to amend his original complaint, but only to correct certain typographical errors.  The court has therefore treated all of the motions to dismiss as directed at the allegations of the amended complaint, which differ from those of the original complaint only in the correction of the typos.

[3]Both this corporation and its principal, Thomas J. Fini, have been named as defendants.  For simplicity's sake, they are referred to collectively as "Fini."

2

January 2001.  They were introduced to Fini through defendant
Charles Cleary, an attorney at the New Hampshire law firm of
Wadleigh, Starr and Peters, PLLC, who had represented them in
other matters.[4]  Hall and Fortin signed an exclusive listing
agreement, obligating them to pay Fini a five percent commission
upon sale of the parcel to a purchaser introduced to it during
the term of the agreement and, in turn, obligating Fini "to pay
any other brokers involved in the transaction."

Fini hired defendant James Horgos as a real estate
salesperson in December 2001.[5]  Hall alleges that this marked the
beginning of a "scheme" by defendant Kent Brooks, who owns used
car retailing and wholesale businesses that have also been named
as defendants here, "to purchase inventory of used vehicles and
the property" (capitalization corrected).  Brooks did ultimately
buy the property, including Hall's and Fortin's interest, in a
transaction that closed on October 15, 2002.

According to Hall, Brooks promised Horgos future employment
at Brooks's businesses, and related benefits, in exchange for his

---

[4]Both Cleary and Wadleigh, Starr and Peters are named as
defendants.  For simplicity's sake, they are referred to
collectively as "Cleary."

[5]Both Horgos and his company, Horgos Enterprises, have been
named as defendants.  For simplicity's sake, they are referred to
collectively as "Horgos."

agreement to "infiltrate" Fini, i.e., ensure that it served Brooks's interests, rather than Hall's and Fortin's, in the eventual sale of the property.  Hall alleges that Brooks similarly "infiltrated" defendant Vineyard Investment Group, LLC, the title company that eventually handled the closing, by promising its principals "benefits of the profits of closing the loan [and] future mortgage loans on the property."[6]  Hall further alleges that, around this time, Brooks also convinced defendant William Fenton, who also sells cars for a living, to lend Brooks money to buy the property in an arrangement for what Hall calls "a silent second mortage."  Thus, Hall claims, Brooks, Vineyard, and Fenton were all joined in a "conspiracy" against him to accomplish Brooks's acquisition of the property.

Hall alleges that, in furtherance of this scheme, Horgos worked as Brooks's "inside man," funneling him information on Hall's and Fortin's position, including the terms of their agreement with their broker, Fini.  This tactic, Hall says, was used to "drive down the price of the property," though he alleges no facts to support this theory, i.e., that the price was actually lowered as a result of negotiations.

---

[6]Brooks has sued Vineyard Investment Group; a related entity, Vineyard Financial Services, LLC; and their principals, Carol DeCola and Richard Bielagus.  For simplicity's sake, these defendants are referred to simply as "Vineyard."

Hall also claims that, to conceal Horgos's role--and to accomplish another integral part of the scheme discussed more fully _infra_--Brooks had to convince the sellers that "he was represented by a legitimate broker."  To accomplish this, Brooks allegedly forged a letter of intent to Horgos, bearing the letterhead of "Five Star Realty" and the signature of defendant Richard DeCola in his capacity as "Broker, Five Star Realty." The letter stated that DeCola, who was the broker for Brooks, saw the fair market value of the property as between $550,000 and $600,000 and that "Brooks is prepared to enter into a Purchase and Sales Agreement immediately if you are agreeable to a price within that range," subject to certain specified conditions.

Within thirty days of the letter of intent, Hall and Fortin entered into a purchase and sales agreement ("P&S"), prepared on Brooks's behalf, to sell their interest in the property to him for $650,000.  The P&S recited the parties' understanding that "Five Star Realty Agency represents buyer, Kent A. Brooks in this transaction" (capitalization corrected).  Fini subsequently issued a "broker invoice" for a "net commission" of $12,500, i.e., five percent of the $650,000 sale price, less $20,000 that Brooks had placed in escrow with it.  According to the amended complaint, the invoice stated that Fini "would be responsible to pay the 50% co-broke [_sic_] fee to 5-Star Realty."

Less than two weeks before the closing, Brooks, on behalf of an entity he had created to take title to the property, defendant 1953 Realty Group, LLC, gave a mortgage in the property to Fenton.  This mortgage was fraudulent, Hall charges, because it was unknown not only to him and Fortin, but to Centrix Bank and Trust, which was unaware of it when loaning Brooks $520,000 toward his purchase of the property.  In fact, Hall alleges, Brooks falsely stated in executing the mortgage with Centrix that he held lien-free title to the property.  The mortgage with Fenton, though, did expressly state that it was subordinate to the mortgage with Centrix.

Hall also alleges that on the day of the closing Brooks, Horgos, Vineyard, Fini, and Cleary--who had been providing legal representation to Hall and Fortin in the transaction--"knowingly failed to disclose, omitted and concealed" from Hall, Fortin, and others that DeCola "would be gifting a commission (to which he had no right to [*sic*]) to Brooks" (capitalization corrected). Prior to the closing, however, Brooks received a copy of the Department of Housing and Urban Development settlement statement, reciting a contract sales price of $633,750--that is, the original $650,000 set forth in the P&S less DeCola's $16,250 commission, which was itself half of the $32,500 due Fini and paid to it by Hall and Fortin at the closing per the listing

agreement.  Hall also alleges that, with Cleary's assistance, he discussed the settlement statement with Brooks and Vineyard to ensure its "bottom line numbers matched Hall's calculated bottom line numbers" (capitalization corrected).  Apparently they did, because the closing proceeded, with Hall receiving $209,642.

Several months later, around February 2003, Brooks gave a mortgage in the property to Vineyard, and began employing Horgos at one of his businesses, defendant Millennium Auto Sales, Inc. These actions, Hall alleges, were consideration for Vineyard's and Horgos's role in Brooks's scheme to acquire the property.[7]

Then, on March 19, 2004, Hall filed a complaint against Fini with the Real Estate Commission, charging that he had violated the New Hampshire Real Estate Practice Act, N.H. Rev. Stat. Ann. ("RSA") § 331-A, by acting for both sides in the transaction, directing payment of a commission to DeCola, making various misrepresentations and non-disclosures, misplacing the deposit money, and otherwise breaching its fiduciary duty to Hall.  Hall alleges that, in response, Brooks coerced Fortin into withholding

---

[7]Hall also alleges that Vineyard subsequently gave Brooks another loan, secured by a mortgage on property he and his wife owned in Bedford, New Hampshire, and that this transaction was fraudulent in various respects--though not as to him, because he was not a party to any aspect of it.

testimony from the Commission by threatening to stop purchasing automobile parts and servicing from him.

The Commission rejected Hall's complaint, notifying him that "[f]rom the information furnished . . . it does not appear that a case of unlawful, dishonest, fraudulent conduct or any prohibited act contained in RSA 331-A . . . on the part of [Fini] has been established."  The Commission also denied Hall's later request that it reconsider this decision.  Hall charges that Fini--joined by Brooks, Horgos, Vineyard, Fenton, and DeCola--achieved these results by (1) bribing the chairman of the Real Estate Commission, defendant Arthur Slattery, (2) causing Horgos and Fini to withhold information from the Commission, (3) suborning perjury from Horgos, and (4) otherwise providing false information.  Hall appealed the Commission's decision to the New Hampshire Supreme Court, which declined to hear the case, <u>see</u> <u>Appeal of Hall</u>, No. 2005-0024 (N.H. Apr. 27, 2005) (citing N.H. Supr. Ct. R. 10(1)), then declined to reconsider that decision. Hall subsequently commenced this action on March 18, 2008.


**II.  <u>Applicable legal standard</u>**

In their motions to dismiss, the defendants argue, among other things, that Hall has failed to state a claim under RICO. <u>See</u> Fed. R. Civ. P. 12(b)(6).  To state a claim, a plaintiff must

8

set forth "[f]actual allegations [that are] enough to raise a
right to relief above the speculative level, on the assumption
that all of the allegations in the complaint are true (even if
doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955,
1965 (2007) (citations and footnote omitted).  This showing
"requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do."
<u>Id.</u> at 1964-65.  That is so even though Hall's pro se amended
complaint must be "liberally construed" and "held to less
stringent standards than formal pleadings drafted by lawyers."
<u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007) (applying
<u>Twombly</u> standard to pro se complaint); <u>see also</u>, <u>e.g.</u>, <u>Giarratano
v. Johnson</u>, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (same).

The bar is even higher in cases like this, "where fraud lies
at the core of the action."  <u>Hayduk v. Lanna</u>, 775 F.2d 441, 443
(1st Cir. 1985).  That triggers the elevated pleading standard,
under Rule 9(b) of the Federal Rules of Civil Procedure, that
"the circumstances constituting fraud . . . be stated with
particularity," i.e., that the plaintiff "specify the time,
place, and content of the alleged false or fraudulent
representations."  <u>United States ex rel. Karvelas v. Melrose-
Wakefield Hosp.</u>, 360 F.3d 220, 232 (1st Cir. 2004).  This
heightened standard applies to claims of RICO violations

9

predicated on alleged acts of mail and wire fraud, like Hall's. See, e.g., Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 (1st Cir. 2006); Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir. 1991); New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987).

Defendants Slattery and Fini also move to dismiss the claims against them for lack of subject-matter jurisdiction under the Rooker-Feldman doctrine, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); D.C. Ct. of Appeals v. Feldman, 460 U.S. 462 (1983). This places the burden on Hall to show that subject-matter jurisdiction in fact exists but, in satisfying this burden, he receives the benefit of treating all of the well-pleaded facts in the amended complaint as true.  See Federacion de Maestros de P.R. v. Junta de Relaciones del Trabajo de P.R., 410 F.3d 17, 20 (1st Cir. 2005).

III. **Analysis**

As an initial matter, Slattery and Fini are incorrect that Hall's claims against them are barred by the Rooker-Feldman doctrine as a result of the ultimate outcome of his complaint to the Real Estate Commission.  The doctrine, as refined by the Supreme Court in ExxonMobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005), applies only to "cases brought by

state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284 (emphasis added). The doctrine thus protects the Supreme Court's exclusive jurisdiction, by way of certiorari, over appeals from state courts. Id. at 291.

Though it is hard to identify what Hall's claimed injury from the Real Estate Commission proceedings is, it is easier to identify what it is not: an injury "caused by" the outcome of those proceedings in the sense that the outcome itself violated Hall's rights.[8] See McCormick v. Braverman, 451 F.3d 382, 392 (6th Cir. 2006), cert. denied, 128 S. Ct. 41 (2007). "Instead, [Hall] asserts independent claims that those [decisions] were procured by certain [d]efendants through fraud, misrepresentation, or other improper means." Id. As the Sixth Circuit reasoned in McCormick, those kinds of claims do not

_____

[8]The court of appeals has held that the New Hampshire Supreme Court's refusal to hear an appeal creates a "state-court judgment" for purposes of applying the Rooker-Feldman doctrine because it results in a decision reviewable by certiorari to the United States Supreme Court. Hill v. Town of Conway, 193 F.3d 33, 40-41 (1st Cir. 1999). And the view of "state-court judgment" in this context has only become broader in light of Exxon Mobil. Federacion de Maestros, 410 F.3d at 27-28. The state supreme court's refusal to hear Hall's appeal from the Real Estate Commission's dismissal of his complaint, then, amounts to a "state-court judgment" under Rooker-Feldman.

implicate the Rooker-Feldman doctrine because they do not require this court to conduct de facto appellate review of the Commission's decisions, but to assess the legality of the defendants' actions.  Id. at 393-95; see also Bolden v. City of Topeka, 441 F.3d 1129, 1145 (10th Cir. 2006); Davani v. Va. Dep't of Transp., 434 F.3d 712, 718 (4th Cir. 2006); Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 88 (2d Cir. 2005).

It is true that, as Slattery and Fini argue, this court could not rule in Hall's favor on his claims against them without "revisit[ing] Hall's allegations that were rejected at the [Commission] . . . and determin[ing] that the [Commission] should not have ruled" as it did.  These concerns are no longer sufficient to trigger the Rooker-Feldman doctrine.  They were sufficient under some pre-Exxon Mobil authority, see, e.g., Rosenfeld v. Egy, 346 F.3d 11, 18-19 (1st Cir. 2003), but the Supreme Court has since explained that Rooker-Feldman does not apply "[i]f a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party."  Exxon Mobil, 544 U.S. at 293 (quotation marks and brackets omitted).  It is the doctrines of res judicata and collateral estoppel, not Rooker-Feldman, that prevent a federal court from revisiting claims

12

adjudicated by a state court.  See id.; Lance v. Dennis, 546 U.S. 459, 466 (2006).

While the Real Estate Commission's dismissal of Hall's complaint against Fini would appear to preclude Hall's claims against Fini here, see, e.g., Cook v. Sullivan, 149 N.H. 774, 777-78 (2003), Fini has not made any res judicata argument. Though the court could nevertheless take up the defense sua sponte, see Banco Santander de P.R. v. Lopez-Stubbe (In re Colonial Mtg. Bankers Corp.), 324 F.3d 12, 16 (1st Cir. 2003), there is no reason to do so, because Fini and the other defendants are correct that Hall has failed to state a RICO claim against them.[9]

Even "[t]o have standing in a civil RICO claim, [Hall] must show 'some direct relation between the injury asserted and the injurious conduct alleged'"--namely, "that the defendant[s'] specified acts of racketeering were the proximate cause of [his] injuries." George Lussier Enters., Inc. v. Subaru of New Eng., Inc., 393 F.3d 36, 51 (1st Cir. 2004) (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)); see also 18 U.S.C. § 1964(c). Hall's amended complaint, even when liberally

---

[9]For the same reason, the court need not reach Slattery's judicial immunity argument.

13

construed, fails to allege any injury at all, let alone one proximately caused by the alleged predicate acts of racketeering.

Hall claims to have been harmed by (1) losing profits on the sale of the property "through slanted or rigged negotiations," and (2) not receiving the "honest services" of Fini, Vineyard, Cleary, and the Real Estate Commission.  These claims proceed from Hall's charge that Brooks bribed (or, in certain cases, duped) some of the other defendants, like Horgos, Fini, Vineyard, and Slattery, to ensure that the deal for the property resolved in favor of Brooks at the expense of Hall and Fortin, and, after that had been accomplished, to keep the defendants' wrongdoing hidden from scrutiny.  Putting aside whether Hall has alleged facts sufficient to support such a serious charge, he has failed to allege facts sufficient to show that these acts, even if they occurred, injured him.

The only facts set forth in the amended complaint that could even theoretically support Hall's claim that the negotiations were "slanted" or "rigged" against him are his account of Horgos's role, i.e., that he used his position in Fini's agency to provide Brooks with "inside information" on Hall's and Fortin's negotiating position.  There are at least two problems with Hall's "inside man," theory, however.

14

First, Hall has not alleged any of the particulars of Horgos's communications with Brooks on this subject, e.g., their time, place, or content.  Hall is bound to do so, as discussed supra, because those communications, which he repeatedly describes as integral to the claimed "scheme to defraud," are part of "the circumstances constituting fraud" in this case.  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996). By failing to allege Horgos's transmissions of inside information to Brooks with particularity, Hall has violated both the letter and spirit of Rule 9(b), which exists in part "to protect defendants whose reputation may be harmed by meritless claims of fraud."  Karvelas, 360 F.3d at 226 (quotation marks omitted); see also Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999) (observing that Rule 9(b) "assure[s] that the charge of fraud is responsible and supported, rather than defamatory and extortionate").

Second, even if Hall had adequately alleged that Horgos was feeding Brooks inside information, the amended complaint sets forth no facts suggesting that these actions caused Hall any harm.  Brooks purchased the property for $650,000, some $50,000 more than his broker, DeCola--who, despite Hall's curious belief to the contrary, undoubtedly was Brooks's broker, as discussed infra--had indicated the property was worth.  Hall alleges

nothing to suggest that the property could have fetched more, such as the course of the parties' negotiations or other offers he and Fortin received for the property either before or after they accepted Brooks's.  Furthermore, Hall's "inside man" theory relies heavily on Horgos's allegedly disclosing the terms of Hall's and Fortin's agreement with Fini, but Hall does not coherently explain how knowing those terms--which are simply the standard provisions of any exclusive listing agreement--would have given Brooks any advantage in the negotiations.  Hall's allegations of harm from Horgos's actions, then, are not "enough to raise [his] right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1964-65; see also Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991) (holding that a RICO claim is not stated "simply by asserting an inequity attributable to a defendant's conduct").

And Hall's "inside man" theory is his only claim of injury that makes even the slightest bit of sense.  Hall's primary theory--what he describes as "the 'HOOK' of the fraud" against him--relies on the references to DeCola's brokerage as "Five Star Realty" in the letter of intent, the P&S, and other materials circulated in connection with the transaction, when the name of DeCola's business is actually "5 Star Realty," i.e., with the number expressed as a numeral rather than a word.  This "fraud,"

16

Hall explains, allowed Brooks to "portray that he was represented by an actual broker in the transaction," when in fact, through Horgos, Brooks had Fini doing his bidding.

Needless to say, DeCola was "an actual broker" for Brooks who was identified as such, by that name, in the letter of intent--even if that document also happened to spell the name of his business with a "Five" rather than a "5."[10]  So it is pure fantasy to say that Brooks "pretended" that DeCola was representing him in the deal, because he was, but, in any event, Hall has not sufficiently alleged any harm from what he believes was Horgos's secret representation of Brooks, as just discussed. Nor does Hall explain how DeCola's allegedly masquerading as Brooks's broker somehow concealed Horgos's allegedly working for Brooks, as Hall charges; it strains logic to assume that, if Brooks had not identified any broker who was working for him, Hall would have realized that Horgos must have been.  Indeed, parties to real estate deals regularly proceed without brokers, such that doing so would be highly unlikely to arouse suspicion.

---

[10]Hall calls the letter of intent "the FORGERY," alleging that it was not created by DeCola, but by Brooks and Horgos.  But even if Brooks and Horgos did "forge" the letter without DeCola's permission, that does not change the fact that DeCola, though "5 Star Realty," was acting as Brooks's broker in the transaction.

Hall also claims that identifying DeCola's business as "Five Star" rather than "5 Star" in the deal documents somehow disentitled him to a commission, making everyone who worked on the deal a participant in a fraud.  Even allowing for Hall's lack of legal training and experience, that claim is absurd.  First, what matters in contracts is not whether the names of the parties are properly spelled, but whether they accurately reflect the parties' understanding.  See, e.g., 27 Richard A. Lord, Williston on Contracts § 70:93 (4th ed. 1993).  The parties understood, from both the letter of intent and the P&S, that an agency called "Five Star Realty" was representing Brooks in the transaction, regardless of how that name was spelled.  Indeed, even if the spelling of the name were somehow relevant, Hall alleges that, in the fall of 2002, Fini issued an invoice noting its obligation "to pay the 50% co-broke [sic] fee to 5-Star Realty" (emphasis added), so Brooks's broker had been identified by its properly spelled name before the deal closed anyway.

Second, assuming that the proper spelling of the name did have some effect on DeCola's right to the commission, there was still no harm to Hall, because, under his and Fortin's agreement with Fini, that commission was paid out of Fini's commission.  As discussed supra, Hall has not sufficiently alleged any theory disentitling Fini to its commission:  the property was sold to a

18

buyer, Brooks, who had been introduced to it during the term of Fini's listing agreement.[11]

Just as that agreement obligated Hall and Fortin to pay the commission to Fini, it likewise obligated Fini to pay half of it over to DeCola as another "broker[] involved in the transaction," which is precisely what happened.  It is simply not the case, as Hall appears to believe, that Fini would have been required to "refund" half of the commission to Hall and Fortin if DeCola were not eligible for it because he was not really Brooks's broker, the name of his agency was spelled wrong, or for any other reason;[12] Fini simply would have kept all of the commission for itself, as the listing agreement provides.  Hall did not suffer any injury from DeCola's receipt of a commission on the sale (or, for that matter, from statements that funds were placed on escrow with or paid to "Five Star Realty" and the like).

Nor did Hall suffer any injury from DeCola's gifting the commission to Brooks.  Again, Hall and Fortin were obligated to

---

[11]Hall also appears to be barred from asserting any such theory here as a result of the res judicata or collateral estoppel effect of the Real Estate Commission proceedings, as mentioned <u>supra</u>.

[12]This includes Hall's suggestion that DeCola was ineligible for the commission because he allowed his broker's license to lapse "in the period between March, 2002 until October 2002."

pay a commission to Fini, who in turn was obligated to pay half
of that commission to DeCola, and that is what happened.  What
DeCola did with his share of the commission afterwards made not
the slightest bit of difference to Hall.  In fact, what DeCola
did do with the money--giving it to Brooks to reduce his down
payment--appears to have helped the deal to close when it
otherwise might not have, based on representations that Hall
makes in his objections to the motions to dismiss.  This worked
to Hall's benefit, at least in the absence of allegations, as
noted supra, that a deal more favorable to him and Fortin was in
the offing.[13]

       That is the fundamental problem with Hall's lawsuit:  it
accuses a number of parties of racketeering, fraud, conspiracy,
and other malfeasance for their assistance in helping him

_____

       [13]Hall describes, as "[t]he crux of [his] complaint," the
the defendants' actions "foreclosed any further negotiations for
the $16,250."  As just discussed, it was the listing agreement
Hall and Fortin signed--rather than anything any of the
defendants did--that required them to pay the commission to Fini,
and Fini to pay half of it to DeCola.  And if DeCola were not
entitled to half of it, Fini would have been entitled to all of
it.  Hall does not explain, and certainly does not allege any
facts tending to suggest, why Fini would nevertheless have agreed
to refund some of its commission to Hall and Fortin.  This
speculative theory does not state a claim for relief.  See Bell
Atlantic, 127 S. Ct. at 1964-65; Lerner v. Fleet Bank, N.A., 318
F.3d 113, 123-24 (2d Cir. 2003) (ruling that plaintiff failed to
allege causation for RICO claim based on "inherently speculative"
assumptions about how third parties would have acted but for the
alleged racketeering activity).

complete a deal that he agreed to make and that, by all indications, was the most favorable one available to him.  So Hall's claim that he was deprived of the "honest services" of Fini, Vineyard, and Cleary, even if true, does not assert any injury.  Assuming, <u>dubitante</u>, that those parties were secretly working for Brooks, he was trying to achieve the same objective Hall and Fortin were, namely, his purchase of the property from them.  Especially puzzling is Hall's reliance on alleged conduct, e.g., Brooks's enlisting the help of his relative "Jane Doe" to evict a subtenant from the property, or receiving a "secret second mortgage" loan from Fenton, that, while perhaps less than honest, had no effect whatsoever on Hall--other than the beneficial one of helping the deal he had struck to close.  <u>Cf.</u> <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 191 (1st Cir. 1996) (observing that plaintiffs could not show causation for RICO claim arising from defendant's refusal to do business after they stopped paying bribes because "if there had been no bribes, [there is] no reason to think that plaintiffs would have gotten any [of defendant's] business at all.")

Indeed, aside from the insufficient allegations of Horgos's role, Hall has set forth no facts suggesting that any of the defendants had any influence on his decision to agree to sell his and Fortin's interest in the property to Brooks for $650,000.

That omission is significant because the vast majority of the
acts alleged in the amended complaint occurred <u>after</u> Hall and
Fortin had signed the P&S agreeing to do just that.  <u>See</u> <u>Efron v.</u>
<u>Embassy Suites (P.R.), Inc.</u>, 223 F.3d 12, 17 (1st Cir. 2000)
(observing that plaintiff who invested in a "partnership before
any of the alleged predicate acts occurred, and thus without
reliance on any misrepresentations" could not state a RICO claim
arising out of the loss of his investment for lack of causation).
Given that the deal closed on those essential terms, there is no
way any of this post-agreement conduct could have harmed Hall--it
only helped him to sell his interest in the property for more
than $200,000, as he agreed to do.[14]  Hall has therefore failed
to state a RICO claim against the defendants.  <u>See</u>, <u>e.g.</u>, <u>Sanchez</u>
<u>v. Triple-S Mgmt. Corp.</u>, 492 F.3d 1, 14 (1st Cir.), <u>cert. denied</u>,
128 S. Ct. 806 (2007); <u>George Lussier Enters.</u>, 393 F.3d at 51-52;
<u>Camelio v. Am. Fed'n</u>, 137 F.3d 666, 670-71 (1st Cir. 1998).

---

[14]Hall suggests that these acts "concealed" earlier
fraudulent conduct but, assuming there were any, Hall could not
have been harmed by the defendants' concealing conduct that did
not harm him any more than he was harmed by the conduct itself.
The most significant example is the defendants' alleged
malfeasance in the proceedings before the Real Estate Commission
on Hall's complaint against Fini:  since Hall has not adequately
alleged that Fini's actions harmed him, he likewise could not
have been harmed by the Commission's decision that Fini's actions
were not illegal.

These RICO claims provide the only basis for subject-matter jurisdiction in this court.  There is no diversity jurisdiction, because this is not a suit between "citizens of different states."  28 U.S.C. § 1332(a)(1).  Hall is a citizen of New Hampshire, as are all but one of the defendants.  Contrary to Hall's fundamental misunderstanding of the doctrine, then, the fact that one of the defendants is not a New Hampshire citizens cannot support diversity jurisdiction:  the plaintiff cannot be a citizen of the same state as any defendant.  See Strawbridge v. Curtiss, 7 U.S. 267 (1806).  This court therefore has only supplemental jurisdiction over Hall's state-law claims, which it declines to exercise.  See 28 U.S.C. § 1367(c)(3); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

In ruling on the motions to dismiss for failure to state a claim, this court has, as it must, accepted all of the factual allegations in Hall's amended complaint as true.  In so doing, the court in no way suggests that any of these very serious allegations--including racketeering, secret deals, kickbacks, perjury, and bribery of a state official--have any basis in fact. Indeed, what Hall appears to have done is to use unrelated and innocuous dealings among various defendants (e.g., Horgos's going to work for Brooks several months after the deal, Vineyard's making a mortgage loan to Brooks on an different parcel,

Slattery's holding reciprocal easements with Vineyard's owners on different parcels) as the jumping-off point for a far-ranging and inherently implausible conspiracy theory in which everyone else who participated in the deal were secretly aligned against him. The basic rules of this court do not allow lawsuits premised on such fanciful speculation, even by parties appearing without counsel, <u>see</u> Fed. R. Civ. P. 11(b)(3), and provide for serious sanctions when they are violated, <u>see</u> Fed. R. Civ. P. 11(c). Hall should consider himself warned.

### III. <u>Conclusion</u>

For the foregoing reasons, the defendants' motions to dismiss (documents no. 30, 35, 44, 63, 68, 87) are granted on the basis that Hall has failed to allege the necessary injury to support his RICO claims. The court does not reach any of the other arguments presented by the motions. Slattery's motion to dismiss (document no. 24) is denied, but he is nevertheless dismissed from the case as a result of Hall's failure to state a RICO claim. Defendant Jane Doe is dismissed from the case as not timely served. The court declines to exercise supplemental jurisdiction over Hall's state-law claims. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated:  February 11, 2009

cc:  Daniel E. Hall, pro se
     Michael J. Connolly, Esq.
     John-Claude Sakellarios, Esq.
     Ralph Suozzo, Esq.
     John F. Bielagus, Esq.
     David I. Bailinson, Esq.
     Nancy J. Smith, Esq.
     John G. Cronin, Esq.
     Christopher P. Mulligan, Esq.